22-3217
*United States v. Green*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 15th day of October, two thousand twenty-four.

PRESENT:

>PIERRE N. LEVAL,
>RICHARD J. SULLIVAN,
>SARAH A. L. MERRIAM,
>    *Circuit Judges.*

_____

UNITED STATES OF AMERICA,

>*Appellee*,

>v.                                                              No. 22-3217

ERNEST GREEN, a.k.a. Fire,

>*Defendant-Appellant*.

_____

For Defendant-Appellant: MARK A. FOTI, The Foti Law Firm, P.C., Rochester, NY.

For Appellee: TIFFANY H. LEE, Assistant United States Attorney, *for* TRINI E. ROSS, United States Attorney for the Western District of New York, Buffalo, NY.

Appeal from a judgment of the United States District Court for the Western District of New York (Frank P. Geraci, Jr., *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the district court's December 12, 2022 judgment is **AFFIRMED**.

Defendant Ernest Green appeals from a judgment of the district court following his conviction after a jury trial for illegally possessing a firearm as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The evidence in this case demonstrated that Green, a convicted felon, borrowed a car to carry out a drive-by shooting, crashed the borrowed vehicle into a tree after taking return fire, and then fled from the vehicle while carrying a firearm, which he ultimately discarded along the path of his escape route. Presentence Investigation Report ("PSR") ¶¶ 5–8. On appeal, Green argues that the district court erred by (1) denying his motion to exclude DNA evidence and his request for a *Daubert* hearing; (2) denying his motion to suppress DNA evidence; (3)

2

overruling his objection to the opposing expert's use of the term "epithelial swab" during her testimony; (4) refusing to show prospective jurors a video on implicit bias and failing to ask them questions about racial bias; and (5) applying two sentencing enhancements that he contends were not supported by sufficient evidence. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

## I.    Motion to Exclude DNA Evidence

Green first argues that the DNA evidence linking him to the gun should not have been allowed into evidence because the genotyping software ("STRmix") that produced it was unreliable. According to Green, STRmix is untrustworthy because it requires the forensic technician to subjectively estimate the number of people whose DNA appears in a given sample and because it "will produce a different [result] each time" it is run. Green Br. at 27–30. He contends that the district court "should have, at a minimum, ordered a hearing to take testimony on the . . . software, and specifically, the manner in which it is utilized by the [forensics lab]." Green Br. at 30. We disagree.

We review a district court's decision whether to admit expert testimony for abuse of discretion, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997), which we will

3

find only where the admission of expert testimony was "manifestly erroneous," *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020). District courts are afforded considerable leeway when determining whether expert testimony is reliable and, therefore, admissible. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In making such a determination, district courts may consider a variety of factors, such as (1) whether the technique can be tested, (2) whether the technique has been subjected to peer review, (3) the technique's known or potential rate of error, (4) whether there are maintained standards controlling the technique's operation, and (5) whether the technique has been generally accepted. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). However, the law is clear that these factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141. In fact, a district court is afforded "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142.

Considering the substantial leeway that we afford district courts to decide how and whether certain evidence is reliable, we are not persuaded that the district court's denial of a *Daubert* hearing and its admission of the DNA evidence constituted an abuse of discretion. As the district court pointed out in denying

4

Green's motion below, the forensics lab's protocols provide that "the minimum number of [DNA] contributors to a mixture is determined by counting the number of alleles at the locus that exhibits the greatest number of allelic peaks and then dividing that number by [two]." J. App'x at 343 (internal quotation marks omitted). "If the maximum number of alleles is an odd number, the value is rounded up." *Id.* So, for example, "if at most [seven] alleles are detected per locus, the resultant minimum number of contributors will be [four]." *Id.* (internal quotation marks omitted). As the lab protocol recognizes, other factors can complicate this interpretation process. *See id.* at 43–44. But while the technician's decision required judgment, it was not arbitrary. The analyst followed the lab protocols. Based on this record, the district court did not err in finding that the minimum number of DNA contributors is determined through a scientific process, not – as Green asserts – on the basis of a technician's whims.

Far from rebutting the district court's findings, Green offers no compelling explanation as to why the variability in the STRmix software renders it unreliable. In fact, he does not even claim that the magnitude of variability is material. As to the district court's decision to forego a *Daubert* hearing, Green presented no evidence suggesting that the government's method lacked accuracy and

5

dependability. Nor does he argue that this technology is not generally accepted. As one of our sister circuits has pointed out, STRmix is widely used "in forensic laboratories across the country" with "[m]ore than [forty-five] laboratories us[ing] it, including the [Federal Bureau of Investigation ("FBI")] and many state law enforcement agencies." *United States v. Gissantaner*, 990 F.3d 457, 466 (6th Cir. 2021). On this record, we cannot say that the district court's decision to admit the DNA evidence constituted manifest error.

Furthermore, there was extensive evidence, including eyewitness testimony, identifying Green as fleeing and asserting that he had a firearm in his possession. PSR ¶ 6. The firearm was then discovered near Green's escape route. PSR ¶ 8. The strength of the evidence of Green's possession of the firearm renders the district court's refusal to exclude evidence harmless, even if erroneous. *See United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992) ("A defendant has a right to a fair trial, but not necessarily to a perfect one, and an error does not warrant reversal if it is harmless." (internal quotation marks and citations omitted)).

## II. Motion to Suppress Tissue and Buccal Samples

Green next argues that the district court should have suppressed the introduction of two DNA samples at trial because the first sample should have

been destroyed by operation of law and the second sample would never have been collected but for the improper retention of the former. Specifically, Green argues that the DNA Identification Act required the FBI and relevant state agencies to expunge the analysis of the first sample from their DNA indexes when the charges underlying the collection of that sample were dismissed. Green contends – without further explanation – that the agencies' failure to expunge that first sample amounted to a Fourth Amendment violation because the agencies no longer had statutory authority to maintain the evidence from the dismissed case. Green also argues that the search warrant application for the second sample violated the Fourth Amendment because it failed to provide the issuing judge with potentially adverse information, *i.e.*, that the DNA analysis linking Green to the gun was improperly retained and should have been discarded. In essence, Green asserts that the issuing judge would not have granted the search warrant application for the second sample had he known that the DNA analysis linking Green to the gun was based on information that should have been expunged. We disagree.

Even assuming that the first sample was the product of an unconstitutional search, it does not follow that the second sample should likewise be suppressed,

particularly given the existence of untainted evidence – including a shots-fired call placed around the time of the shooting; eyewitness interviews indicating that Green was involved in the shooting, fled the scene, and carried a gun during that time; and the discovery of the gun itself on the very route that Green took after the shooting. *See United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997) (explaining that when tainted evidence is included in an affidavit for a warrant, "a reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant" (alterations and internal quotation marks omitted)); *United States v. Peeples*, 962 F.3d 677, 688–89 (2d Cir. 2020) (same); *see also United States v. Reilly*, 76 F.3d 1271, 1282 n.2 (2d Cir. 1996) ("The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." (internal quotation marks omitted)). All this evidence independently establishes probable cause to justify the issuance of a warrant to collect the second DNA sample from Green. The district court, therefore, did not improperly deny Green's motion to suppress.

**III.   Forensic Analyst's Use of the Term "Epithelial Swab"**

Green next argues that the forensic analyst's use of the term "epithelial swab" during her testimony to refer to one of the swabs used to collect DNA from the gun lacked a proper foundation.   Green specifically asserts that the government failed to introduce any "scientific" proof, such as confirmatory or presumptive testing, to support a finding that the swab was an epithelial swab as opposed to a swab of some other biological material.   Green Br. at 35.   Green contends that use of the term "epithelial swab" was unduly prejudicial because the term epithelial is synonymous with possession, and so its use improperly implied that he possessed the firearm.   Again, we are not persuaded.

As noted above, we review a district court's evidentiary rulings for abuse of discretion and will only disturb such rulings when they are "manifestly erroneous."   *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015).   Here, the analyst testified that "DNA can be deposited in multiple different ways," including from skin cells and blood, J. App'x at 596, and that she performed two swabs of the firearm:   one on the dried red stains found on the gun and another, "avoiding any type of dried red stain[]," on "the most common areas touched by someone . . . handling a firearm," J. App'x at 609.   This testimony provided ample

9

justification for the use of the term "epithelial swab."   Regardless, the difference in probative value is insignificant, given all the other evidence of Green's possession of the firearm.   We therefore cannot say that the district court manifestly erred by permitting that term to be used at trial.

## IV.   Implicit Bias Video and Racial Bias Questions

Green next asserts that the district court abused its discretion during *voir dire* by denying his request to show a video on implicit bias to the venire and by declining his request to ask specific questions of the jurors related to racial bias. But this claim likewise fails.

A district judge is afforded "broad discretion" when conducting *voir dire*. *United States v. Nieves*, 58 F.4th 623, 626 (2d Cir. 2023).   For reversal to be warranted, the record must show that:   (1) *voir dire* was "so demonstrably brief and lacking in substance" that counsel had too little information to draw any conclusions about a potential juror's general outlook, experience, and lifestyle; (2) "a systematic or pervasive bias . . . exist[ed] at the time of trial[] in the community" that would have been cured had the court made the inquiries requested by counsel; or (3) the record, when "viewed in its entirety," suggests "a substantial possibility" that the jury misunderstood its duty to weigh certain evidence fairly

10

and that such misunderstanding "would have been clarified by asking a requested *voir dire* question." *United States v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002).

Green does not seriously contend that the *voir dire* was so demonstrably brief and lacking in substance that he could not understand potential jurors' general outlook, experiences, and lifestyle. This is hardly surprising, since the record – including the sealed *voir dire* transcript – makes clear that the district judge asked numerous questions about the jurors' families, jobs, hobbies, interests, and experiences with the legal system that provided ample bases from which Green could draw conclusions about the potential jurors. Nor does he suggest that the jury misunderstood its duty to weigh certain evidence fairly. Instead, Green principally argues that the district court countenanced a systemically biased jury pool when it refused to show prospective jurors the video on implicit bias or ask them questions related to racial bias. But our case law is clear that generic assertions of racial bias are not enough to overturn a jury verdict. *See United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994). Rather, Green bears the burden of establishing "substantial indications" that racial prejudice likely affected the jury. *Id.* (holding that the district court did not commit reversible error when refusing to ask jurors questions about racial prejudice merely because the case involved a

11

black defendant and a white victim); *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981) ("Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion."). Other than noting that Green is black in a predominantly white district and conclusorily citing to a few articles about inherent bias, Green points to nothing in the record reflecting that there was systemic or pervasive bias in the *venire.* Accordingly, we cannot say that the district court abused its discretion when it denied Green's *voir dire* requests.

## V. Procedural Reasonableness of Green's Sentence

Green next argues that the district court procedurally erred in calculating his sentencing range when it increased his offense level by four levels under section 2K2.1(b)(6)(B) of the United States Sentencing Guidelines and by two levels for obstruction of justice under section 3C1.1. Again, we disagree.

We review the procedural reasonableness of a sentence for abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence is procedurally unreasonable when the district court has committed a "significant

12

procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [section] 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* "A finding [of fact] is clearly erroneous when . . . the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *United States v. Cuevas*, 496 F.3d 256, 267 (2d Cir. 2007). We address each of the enhancements in turn.

## A. Four-Level Enhancement Under U.S.S.G. § 2K2.1(b)(6)(B)

Section 2K2.1(b)(6)(B) provides for a four-level enhancement when the defendant "used or possessed any firearm or ammunition in connection with another felony." U.S.S.G. § 2K2.1(b)(6)(B). Green contends that there was insufficient evidence from which the district court could conclude that he shot at unknown individuals at the Town Gardens.[1]

As an initial matter, Green asserts – for the first time on appeal – that "[t]he [d]istrict [c]ourt should not have applied the enhancement without holding a

---

[1] Green also points out that "there was no felony complaint or other charging document" that would indicate he committed another felony. Green Br. at 48. But a sentencing court may consider "uncharged conduct proven by a preponderance of the evidence as long as that conduct does not increase either the statutory minimum or maximum available punishment." *United States v. Ulbricht*, 858 F.3d 71, 128 (2d Cir. 2017), *abrogated on other grounds* by *Carpenter v. United States*, 585 U.S. 296 (2018).

*Fatico* hearing or at least having considered some evidence and making findings of fact." Green Br. at 49. But Green never sought a *Fatico* hearing either before or during his sentencing. In fact, in his written objection to the PSR, Green took issue with the four-level enhancement solely because there was no previous allegation or admission that he was involved in the shooting. *See* Dist. Ct. Doc. No. 158 at 2. At sentencing, Green stated that he had looked at the investigative material noted in the PSR, acknowledged "that that investigative material exists," and did not contest the accuracy of what was described therein. J. App'x at 941. Even on appeal, he does not challenge the accuracy of the facts contained in the PSR; he merely contests the weight of that evidence and whether it meets the preponderance of the evidence standard. Green Br. at 48–49.

Nor can it be said that the district court failed to make findings of fact on the record before imposing the four-level enhancement. The record reflects that the district court applied facts from the PSR in making its Guidelines calculation and adopted the PSR without change. *See* J. App'x at 946, 962–63 (making specific factual findings related to the sentencing enhancements); Dist. Ct. Doc. No. 163 at 1 (adopting the PSR without change). The facts contained in the undisputed PSR allowed the district court to conclude, by a preponderance of the evidence, that

14

Green did in fact possess a firearm in connection with another felony – namely, shooting at unknown individuals at the Town Gardens, which no party disputes is a felony under New York law. *See* PSR ¶ 6.

First, the PSR reflects that Daniel Regan, the owner of the vehicle involved in the shooting, informed investigators that he saw Green in possession of a firearm the night before the shooting. *See id.* at ¶ 7. Regan also told investigators that Green had gotten into an argument with someone at a night club the evening prior to the shooting and that on the day of the shooting Green asked to borrow Regan's car. *See id.* That afternoon, police responded to a "shots fired call" at the Town Gardens, where, "[a]ccording to witnesses," a black male driving what turned out to be Regan's vehicle shot at unknown males standing in the street before crashing into a tree. *Id.* at ¶ 5. The PSR further asserted, without challenge from Green, that witnesses saw the driver exit the vehicle with a weapon in his hand and run towards Emslie Street. *See id.* According to the PSR, "numerous witness interviews and street camera footage" confirmed that Green was the driver of the vehicle. *Id.* at ¶ 6. Green was then observed fleeing through private property towards Emslie Street. *See id.* Multiple witnesses took

15

photographs of him with his shirt off, and one witness even reported seeing "the butt of a firearm" sticking out of his shorts. *Id.*

The police later recovered a .380 caliber pistol on Emslie Street – which turned out to have Green's DNA on it – just "a short distance from where one of the earlier 911 callers observed the shirtless black male." *Id.* at ¶ 8. Officers also recovered a spent .380 shell casing at the scene of the shooting, *see id.*, and comparison testing between the gun and shell casing, though not conclusive, showed observable "agreement of class characteristics" in addition to "some agreement of [the] individual characteristics between the recovered shell casing and ammunition [that] was test-fired from the recovered firearm," *id.* at ¶ 9.

At sentencing, the district judge concluded that there was "significant evidence" that Green was involved in the shooting at the Town Gardens. J. App'x at 946. Given that the PSR provides considerable circumstantial evidence that Green was the shooter – coupled with the fact that Green did not object to any of the evidence in the PSR – we cannot say that the district court clearly erred in applying a four-level enhancement based on the shooting.

## B. Two-Level Enhancement Under U.S.S.G. § 3C1.1

Green also disputes the application of the two-level enhancement under section 3C1.1 for defendants who "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. Green argues that "the district court did not identify any specific statements, but just made general findings that Green testified flatly that he did not have any weapon[,] and this was obviously extremely wrong." Green Br. at 50–51 (internal quotation marks omitted).

But Green mischaracterizes the record. The court adopted the PSR, which explicitly provided: "[O]n April 14, 2022, the defendant testified at trial. When asked, 'That day [July 26, 2020] did you ever possess any gun? Any firearm?' The defendant responded, 'Not at all.'" PSR ¶ 12; J. App'x at 737. The PSR further stated that Green "testified and provided a version of events . . . that directly contradicted the evidence set forth by the [g]overnment," since he "explicitly denied possessing a firearm on [the day of the shooting]." *Id.* at ¶ 15. This makes clear that, during sentencing, the district court was referring to Green's specific answer to a specific question asked by his own counsel on direct

17

examination. *See* J. App'x at 737 ("Q.  That day did you ever possess any gun?  Any firearm?  A.  Not at all.").  In addition to adopting the PSR in its entirety, the district court at sentencing noted that Green "testified flatly and clearly that he did not possess any firearm."  J. App'x at 963.  Green's assertion that the district court failed to "identify any specific statements" related to the enhancement for perjury is therefore incorrect and provides no basis for overturning the court's application of the two-level enhancement under U.S.S.G. § 3C1.1.

\*    \*    \*

We have considered Green's remaining arguments and find them to be without merit.  Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

18